CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
October 27, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

John Ertl, *on behalf of himself and all others similarly situated*,

Plaintiff,

v.

Fulton Bank, N.A.,

Defendant.

Civil Action No. 3:26-cv-00011

**MEMORANDUM OPINION**

Plaintiff John Ertl alleges that he received an unsolicited telemarking call from Defendant Fulton Bank, N.A. ("Fulton" or "Fulton Bank") in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, and the Virginia Telephone Privacy Protection Act ("VTPPA"), Va. Code § 591.-510 *et seq.*

This matter is before the court on Fulton's motion to compel arbitration. (Dkt. 20.) Fulton asserts that the account agreement for Ertl's checking account with the Bank contains a binding arbitration clause covering this suit. Ertl denies that the arbitration clause was in effect at the time he opened or used his checking account. He also argues that his present suit is not covered by the terms of the arbitration clause. For the reasons below, the court will deny the motion to compel arbitration.

## I. Background

Because "the formation or validity of the arbitration agreement is in dispute," the court considers documents outside the pleadings, including all relevant admissible evidence

submitted by the parties, to effectively assess the merits of the motion to compel arbitration. *Cherdak v. ACT, Inc.*, 437 F. Supp. 3d 442, 454 (D. Md. 2020) (citation omitted); *see also Eubank v. Camping World RV Sales, LLC*, 764 F. Supp. 3d 321, 323 (E.D. Va. 2025).

John Ertl and Serwa Gyamfi opened a checking account with Fulton Bank on June 13, 2018. (McIntyre Supp. Decl. ¶ 6 (Dkt. 20-1); Def.'s Supp. Mem. Ex. A at 1 (Dkt. 20-2).) They both filled out a Retail Account Agreement and signed a Signature Card. (McIntyre Supp. Decl. ¶¶ 6; Def.'s Supp. Mem. Ex. A at 1–2.) The signature card references the "Rules and Regulations for Deposit Accounts," which included an arbitration provision. (McIntyre Supp. Decl. ¶ 7; Def.'s Supp. Mem. Ex. A at 2.) Ertl and Gyamfi then executed two deeds of trust in favor of Fulton Bank on June 29, 2018, and December 2, 2020, respectively. (McIntyre Supp. Decl. ¶¶ 8–9; Def.'s Supp. Mem. Ex. C (Dkt. 20-4); Def.'s Supp. Mem. Ex. D (Dkt. 20-5).) When Ertl applied for the loan secured by the 2018 deed of trust, he gave his cell phone number to the Bank. (McIntyre Supp. Decl. ¶ 10.) Starting in July 2018, Ertl and Gyamfi used their Fulton checking account to make monthly installment payments in connection with the two deeds of trust. (*Id.* ¶ 11.) In January 2023, Fulton closed Ertl and Gyamfi's checking account after a period of inactivity. (*Id.* ¶ 12.)

Ertl previously registered his cell phone number on the National Do-Not-Call Registry on May 25, 2018. (Compl. ¶¶ 25–26 (Dkt. 1).) He also informed Fulton Bank that he did not want to receive solicitation calls at some unspecified time before the events of this lawsuit. (*Id.* ¶ 27.) On February 13, 2026 at 12:17 pm, Ertl received an unsolicited telemarketing call from Fulton Bank. (*Id.* ¶ 28.) The call consisted of a prerecorded message stating that the call

"was from an agent of Fulton Bank" and instructing Ertl "to call Fulton Bank if he was in the market for a new loan." (*Id.* ¶ 30–33.) Ertl then called Fulton Bank's customer service line to complain about the unsolicited call, and the customer service representative told him that the Bank's records "indicated [Ertl] previously requested to be opted out of marketing communications and that he should not have received such a call." (*Id.* ¶ 34–35.)

Ertl filed a complaint in this court on February 20, 2026. (Dkt. 1.) Count 1 alleges a violation of section 227(b) of the TCPA by placing prerecorded telephone calls to his phone number without prior express consent. (*Id.* ¶¶ 70–72.) Counts 2 and 3 allege violations of the VTPPA for the same. (*Id.* ¶¶ 76–77, 82–84.) Ertl seeks to bring his suit as a class action on behalf of other individuals who have also received unsolicited prerecorded telemarketing calls from Fulton Bank. (*Id.* ¶¶ 54–68.)

Fulton moved to compel arbitration on May 4, 2026. (Dkt. 20.) In support of its motion, Fulton attached a declaration by Lauren McIntyre, Senior Vice President, Consumer Operation Director at the Bank. (McIntyre Supp. Decl. ¶ 3.) Fulton also attached Ertl's Retail Account Agreement and Signature Card (Def.'s Supp. Mem. Ex. A), the Rules and Regulations for Deposit Accounts as of December 1, 2023, (Def.'s Supp. Mem. Ex. B (Dkt. 20-3)), and the two deeds of trust executed by Ertl and Gyamfi in 2018 and 2020, (Def.'s Supp. Mem. Ex. C; Def.'s Supp. Mem. Ex. D).

Ertl responded in opposition on June 1, 2026. (Dkt 23.) Fulton replied on June 15, 2026. (Dkt. 24.) In its reply, Fulton attached a second declaration by McIntyre. (McIntyre Reply Decl. (Dkt. 24-1).) It also attached copies of the December 9, 2015 Rules and

Regulations for Deposit Accounts (Def.'s Reply Ex. A (Dkt. 24-2)), as well as the March 4, 2019 and December 1, 2019 versions of the Rules, (Def.'s Reply Ex. B (Dkt. 24-3)).

## II. Standard of Review

"A party's burden to show the existence of an agreement to arbitrate is 'akin to the burden on summary judgment.'" *Austin v. Experian Info. Sols., Inc.*, 148 F.4th 194, 202 (4th Cir. 2025) (quoting *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 564 (4th Cir. 2015)). Therefore, in determining whether parties agreed to arbitrate a dispute, "the district court must employ the summary judgment standard as a gatekeeper." *Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021). "In applying that standard, the burden is on the defendant to 'establish[ ] the existence of a binding contract to arbitrate the dispute.'" *Id.* (quoting *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 867 F.3d 449, 456 (4th Cir. 2017)).

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." If the movant meets this burden, the opposing party "must then demonstrate with specific evidence a genuine dispute of material fact." *Kiser v. Truist Fin. Corp.*, 796 F. Supp. 3d 207, 218 (E.D. Va. 2025) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). The court must also "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

## III. Analysis

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. When parties have a written agreement to arbitrate, a court must stay "any suit or proceeding" pending arbitration of "any issue referable to arbitration under [such] an agreement." 9 U.S.C. § 3. "[A] litigant can compel arbitration under the FAA if he can demonstrate '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.'" *Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002). Here, the only contested issue is whether there existed a written agreement including an arbitration clause that covers Ertl's dispute with Fulton.

"[D]ue regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself [should be] resolved in favor of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989). Hence, "[i]f the issues in the case are within the contemplation of the arbitration agreement, the FAA's stay-of-litigation provision is mandatory, and there is no discretion vested in the district court to deny the stay." *United States v. Bankers Ins. Co.*, 245 F.3d 315, 319 (4th Cir. 2001).

### A. Existence of the Agreement to Arbitrate

"Whether an agreement to arbitrate was formed is a question of 'ordinary state law-principles that govern the formation of contracts.'" *Rowland*, 993 F.3d at 257 (quoting *Hill v.*

*Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005)). The FAA creates an "obligation [upon a court] to determine whether a contract was formed." *Id.* at 258. Here, the court finds that an agreement to arbitrate exists between Fulton Bank and Ertl.

Fulton Bank initially submitted the Rules and Regulations for Deposit Accounts that were effective as of December 1, 2023. (*See* Def.'s Supp Ex. B.) Ertl's only response was that the December 2023 version of the Rules did not exist when he opened his account in June 2018, nor did it become effective until after his account was closed in January 2023. (Pl.'s Opp. Mem. at 5–7, 10–11 (Dkt. 23).) Fulton Bank responded by providing the versions of the Rules that were effective as of December 9, 2015; March 4, 2019; and December 1, 2019. (*See* Def.'s Reply Ex. A; Def.'s Reply Ex. B.) The definition of "Claim" is identical in each of the four versions of the Rules. (Def.'s Supp. Mem. Ex. B at 28; Def.'s Reply Ex. A at 28; Def.'s Reply Ex. B at 28, 58.) And the Signature Card accompanying the Retail Account Agreement shows Ertl's name and signature just below the provision that "[w]e have received a copy of the . . . Rules and Regulations for Deposit Accounts and agree to the terms and conditions of this/these account(s)." (*See* Def.'s Supp. Mem. Ex. A at 3.)

Therefore, at the time that Ertl opened the account and signed the Account Agreement, he agreed to be bound by the then-effective Rules, which contained substantially the same arbitration provision as the one submitted by Fulton with its motion to dismiss. (*Compare* Def.'s Reply Ex. A at 27–30, *with* Def.'s Supp. Mem. Ex. B at 27–30.) *Cf. Kiser*, 796 F. Supp. 3d at 222–25 (finding that plaintiffs agreed to be bound by an arbitration provision because they signed signature cards that incorporated by reference an agreement containing the

arbitration provision, and acknowledged receipt of the same). Indeed, Ertl does not contend that he never received or agreed to a then-effective version of the Rules at the time he opened his account. Nor does he allege that he exercised his right to opt out. Instead, he only argues that he never received notice of his opt-out rights under the December 1, 2023 Rules. (Pl.'s Opp. Mem. at 10–11.) But the December 9, 2015 Rules contain a substantially identical version of the opt-out clause. (Def.'s Reply Ex. A at 27.) Hence, Fulton Bank's evidence shows that there is no genuine dispute of material fact as to whether Ertl received and agreed to the Rules containing the arbitration provision at issue.

**B. Extent of the Arbitration Clause**

Ertl argues that even if an arbitration agreement existed, the terms of the arbitration clause do not encompass the present lawsuit. The arbitration clause defines "claim" as follows:

> "Claim" means any claim, dispute or controversy between you and us that in any way arises from or relates to this agreement, your account, any ATM Card, debit card, check card or similar card, any account transaction or attempted transaction (including deposits, payments, transfers and withdrawals, whether by check, card, ACH or otherwise), formal overdraft protection arrangements and informal overdraft services, including any overdraft line of credit or overdraft transfer agreement, non-sufficient funds and overdraft items, and the advertising, disclosures, practices, procedures and agreements related to the foregoing, if such claim, dispute or controversy cannot be resolved without a lawsuit or arbitration proceeding. "Claim" includes disputes arising from actions or omissions prior to the date of this agreement (or prior to the time this Arbitration Provision becomes part of the agreement). "Claim" has the broadest reasonable meaning, and includes initial claims, counterclaims, cross-claims and third-party claims. It includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, regulation, ordinance, common law and equity (including any claim for injunctive or declaratory relief).

(Def.'s Supp. Mem. Ex. B at 28; Def.'s Reply Ex. A at 28; Def.'s Reply Ex. B at 28, 58.) The court must determine "whether the factual allegations underlying [Ertl's] claim[s] are within the scope of the arbitration clause, regardless of the legal label assigned to the claim[s]." *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 319 (4th Cir. 1988).

For the purposes of this motion, Fulton accepts *arguendo* that the prerecorded call to Ertl was about marketing a new loan. (Def.'s Supp. Mem. at 20; Def.'s Reply at 12.) Hence, the subject of the call was neither Ertl's now-closed checking account, nor his two deeds of trust executed in 2018 and 2020, nor any of the other listed features and services in the Rules. Fulton argues, however, that the call "arises from or relates to" Ertl's account because it "pertain[ed] to the Bank's efforts to advertise to an existing customer by placing a call to a telephone number that he voluntarily provided to the Bank in connection with an integrated series of transactions where he opened the Account and signed the 2018 Deed of Trust." (Def.'s Reply at 12.) The court disagrees.

Fulton points to *Mey v. DIRECTV, LLC*, 971 F.3d 284 (4th Cir. 2020), and *Smith v. Walmart, Inc.*, No. 7:22-cv-00568, 2023 WL 5215376 (W.D. Va. Aug. 14, 2023), as cases that are "directly analogous" and "similar" to this case. (*Id.* at 12.) In fact, both cases are readily distinguishable. In both *Mey* and *Smith*, the arbitration clauses at issue encompassed "all disputes" between the parties, full stop. 971 F.3d at 293 ("The arbitration agreement here requires arbitration of '**all disputes and claims** between us.'" (citation omitted)); 2023 WL 5215376, at *4 (arbitration clause "applies to 'any and all disputes between the Parties'" (citation omitted)). In neither case was arbitration limited to disputes "arising from or relating

to" the underlying contract. *Mey*, 971 F.3d at 293 ("These provisions explicitly contemplate that the [arbitration] agreement covers claims beyond those 'arising out of or relating to' the underlying contract."); *Smith*, 2023 WL 5215376, at *4 ("Unlike most arbitration clauses, the agreement between Ms. Smith and Walmart is not limited to disputes arising under or relating to the contract itself.").

By contrast, Fulton's arbitration clause is expressly limited to disputes "aris[ing] from or relat[ing] to" Ertl's checking account, the Rules, and an enumerated list of related features and services. (Def.'s Reply Ex. A at 28.) Furthermore, the list of related features is exclusive, not illustrative, as the clause does not use language such as "including, but not limited to" or "for example." (*See id.*) Therefore, Fulton's arbitration clause does not, by its terms, appear to extend to all disputes between Ertl and Fulton regardless of whether there is a nexus to the checking account and the Rules. Hence, *Mey* and *Smith* are inapposite. Instead, the court must determine whether Ertl's TCPA and VTPPA claims "arise from or relate to" the checking account, Rules, and listed account features and services. The Fourth Circuit has analyzed arbitration clauses containing "arising from or relating to" language by asking whether there is a "significant relationship" between Ertl's claims and the agreement. *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996) (quoting *J.J. Ryan & Sons*, 863 F.2d at 321); *see also Long v. Silver*, 248 F.3d 309, 316–17 (4th Cir. 2001).

Ertl did not provide his phone number to open his checking account. The Retail Account Agreement shows only one phone number ending in "5316," not Ertl's number ending in "8944." (*See* Def.'s Supp. Ex. A at 2; Compl. ¶ 25.) Instead, Fulton obtained Ertl's

number when he "applied for the loan that was secured by the 2018 Deed of Trust contemporaneously with his opening of the Account." (McIntyre Supp. Decl. ¶ 10.) The only connection between this loan and the checking account is that Ertl used the checking account to make payments on the loan. (*Id.* ¶ 11.) Even if Ertl had never opened the checking account, Fulton would still have been able to place the alleged telemarketing call, because the checking account was not the source of Fulton's knowledge of Ertl's number nor the sole reason for placing the call. (Def.'s Supp. Mem. at 20.)

Fulton's position is analogous to the argument rejected by the Fourth Circuit in *Wachovia Bank, Nat'l Ass'n v. Schmidt*, 445 F.3d 762 (4th Cir. 2006). There, Wachovia argued that an arbitration provision in a promissory note executed by Schmidt covered a dispute arising from Wachovia's separate role in advising Schmidt to take part in an ill-fated investment strategy. *Id.* at 768. Wachovia contended that Schmidt's wrongful-inducement claims were significantly related to the note containing the arbitration provision because Wachovia had a "single, integrated course of dealing" with Schmidt in both lending him money and providing him financial advice. *Id.* But the Fourth Circuit held that Schmidt's claims "derived solely" from Wachovia's actions in its financial advisory capacity inducing him to participate in the investment scheme. *Id.* at 769. Therefore, his claims did not arise from or relate to the note containing the arbitration provision. *Id.*

Like Wachovia, Fulton argues that Ertl's claims arise from or relate to "an integrated series of transactions where he opened the Account and signed the 2018 Deed of Trust." (Def.'s Reply at 12.) Like Wachovia, Fulton had two distinct relationships with Ertl: he was

simultaneously "a banking customer and a borrower of the Bank." (*Id.* at 11.) And like Schmidt, Ertl's TCPA and VTPPA claims do not arise from or relate to "the specific relationship created by the relevant agreement": namely, the banking customer relationship created by the Rules and Regulations for Deposit Accounts containing the arbitration provision. *Wachovia Bank*, 445 F.3d at 769. At most, his claims are only related to his borrower relationship with Fulton, as the subject matter of the telemarketing call was the advertising of a new loan. In sum, Ertl's claims arise from a telephone call to market a new loan that had no significant relationship or connection to Ertl's then-closed checking account, the Rules governing that account, or any of the related services and features listed in the Rules.

Fulton repeatedly emphasizes that the arbitration provision is "broad" and "expansive." (Def.'s Supp. Mem. at 19–20.) But the question before the court is not whether the provision is "broad," "expansive," or any other synonym. It is whether this *specific* dispute falls within the plain meaning of the terms of this *particular* arbitration provision according to "general state-law principles of contract interpretation." *Volt*, 489 U.S. at 475. And the federal policy favoring arbitration does not require the court to "override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).

## IV. Conclusion

For the reasons stated, the court **DENIES** Fulton Bank's motion to compel arbitration. (Dkt. 20.)

An appropriate Order will issue.

**ENTERED** this 27th day of October, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE